[Cite as *State v. Black*, 2017-Ohio-4136.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 15 BE 0076 |
| VS. | ) | |
| | ) | OPINION |
| MONTRELL BLACK | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:   Criminal Appeal from the Court of
                            Common Pleas of Belmont County, Ohio
                            Case No. 15 CR 0009

JUDGMENT:                   Affirmed.

APPEARANCES:
For Plaintiff-Appellee      Attorney Daniel P. Fry
                            Belmont County Prosecutor
                            Attorney J. Flanagan
                            Assistant Prosecutor
                            147-A West Main Street
                            St. Clairsville, Ohio 49350

For Defendant-Appellant     Attorney R. Miller
                            329 North Fourth Street
                            Steubenville, Ohio 43952

JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

                            Dated:  June 5, 2017

DeGENARO, J.

**{¶1}** Defendant-Appellant, Montrell Black, appeals the trial court's judgment convicting him of rape of a victim under 13 years old and sentencing him accordingly. Black argues the trial court erred by permitting the State to cross-exam the victim as a hostile witness. Further, he contends his conviction was not supported by sufficient evidence as well as being against the manifest weight of the evidence. For the following reasons, Black's assignments of error are meritless, and the trial court's judgment is affirmed.

### Facts and Procedural History

**{¶2}** Black was indicted in early 2015 for rape, R.C. 2907.02 (A)(1)(b), a first-degree felony. The charges stemmed from Black having sex with J.L., then 12 years old, at a party on June 16, 2012, which also involved two other minor females, F.L. and H.G., Cordale Williams and an identified third male. As recounted below, the gap in time between the offense and indictment was due to a delayed match for Black as the offender in the national DNA database.

**{¶3}** The first of the State's five witnesses was J.L., who was fifteen at the time of trial. On direct examination she testified that she traveled to the Econo Lodge with F.L. and H.G., that they picked up Williams on the way, and upon arriving at the hotel, she smoked marijuana and drank vodka and orange juice. When the prosecutor asked J.L. what happened next, she spontaneously recanted her prior statements made during the investigation about having sex, testifying "I know in this video here I said that I had sex with men there. I didn't. I never had any sexual relationships with any men there."

**{¶4}** In response, the prosecutor made reference to J.L.'s interview at the Harmony House Child Advocacy Center, which took place less than 48 hours after the hotel party. The exchange continued:

> Q.    And you are now telling this jury for the first time that there was no sexual activity that occurred in the motel room?
>
> A.    No, sir.
>
> Q.    But upon seeing the video cued up, you immediately

recognize that that is not what you had told other individuals prior to today's proceedings?

A.     Yes, sir.

Q.     When is it that you had determined that you were going to testify to this jury that you did not have any sexual relationships with anybody inside of the Econo Lodge?

A.     I'm not sure.  I mean, I just want to tell the truth.  I lied.  I lied about the whole thing.  I did go to the hotel room.  I did get drunk, but I never had sex with anybody.

Q.     Do you remember everything that happened in the hotel room?

A.     Yes, sir.

{¶5}   The State then played the video between J.L. and a Harmony House interviewer. In the video, J.L. described the party in detail and made multiple references to having sex with a man named Hood or Hoodie; she was unaware of his full name at that time. J.L. also stated during the interview that she felt bad because someone may go to jail because she wanted to have fun.

{¶6}   After the video was played for the jury, the prosecutor began questioning J.L. about other individuals she had told what happened at the hotel, and she responded "I lied for a long time."  When the prosecutor reminded J.L. that she had told the sexual assault nurse and the deputy responding to the initial call what happened, she acknowledged talking to them, but continued to give contradictory testimony, claiming she couldn't remember, that she lied, and was on drugs during the video. After the prosecutor had begun to use leading questions, defense counsel objected. At this point, at the prosecutor's request, the trial court declared J.L. was a hostile witness.

{¶7}   J.L. continued to testify, maintaining that she did not have sex with anyone; that she was high in the video and had never seen Black before the trial. J.L. did acknowledge that Black's semen was on her underwear, but she did not know

how it got there, noting she and F.L. "shared a lot of the same things."

**{¶8}** Deputy Ervin Fulst of the Belmont County Sheriff's Office was dispatched to J.L.'s residence. J.L. told him that she, F.L. and H.G. had been at a hotel, used alcohol and drugs, and engaged in sexual activity with three males there; specifically J.L. told him that she had had sex with Williams and Hoodie. He also collected from J.L. the jean shorts, shirt, underwear, bra, and tennis shoes she had been wearing at the hotel.

**{¶9}** Detective Sergeant Ryan Allar, who oversees the investigative detective unit, recounted the unit's protocol regarding sex offenses and the initial investigation conducted in this case in 2012. Allar recounted that the resolution of this case was hampered because Black could only be identified by his street name, Hoodie, although Williams was identified and charged at that time. Allar also recounted other details of the investigation; that J.L. stated she had had vaginal and oral sex with both Williams and Hoodie and oral sex with the third unidentified male; and that the SANE nurse report documented J.L. had abrasions on the hard palate of her mouth and redness, swelling and abrasions of the vagina, all consistent with the sexual activity originally recounted by J.L.

**{¶10}** Allar sent the physical evidence to the Ohio Bureau of Criminal Investigation for forensic analysis, which initially did not return a match for a known profile. About 13 months later, the DNA was analyzed again and returned as a match for Black. Allar obtained a known standard for Black and submitted it to BCI for comparison to confirm the match to Black.

**{¶11}** Allar also testified to over a dozen jailhouse calls, which were played for the jury. In these calls, Black identified himself as Hood and discussed with his brother and J.L.'s aunt, persuading J.L. to not appear at trial to testify or to say that she lied about the entire incident.

**{¶12}** Logan Schepeler and Erica Jimenez, both BCI forensic scientists, processed J.L.s rape kit. Schepler was responsible for preparing the evidence samples and Jimenez was responsible for conducting the actual DNA testing. The

samples from the inside layer of her underwear yielded two DNA profiles: J.L.'s and an unknown male. The samples from the inside of her shorts yielded the same results.

{¶13} Jimenez entered the DNA profile of the unknown male into the Combined DNA Index System, a national database, and she later obtained a match to an out-of-state offender sample from West Virginia indicating it was Black's DNA. After receiving a known standard from Allar for Black, the final report as compiled and testified to by Jimenez stated that "Black cannot be excluded as the source of the semen on the underwear or as a contributor to the semen on the shorts." The expected frequency of the occurrence of the DNA profile from the underwear sample was one in 19 quintillion, 700 quadrillion unrelated individuals.

{¶14} Black was the sole witness for the defense. He testified that he was at a bar in Wheeling, West Virginia with friends celebrating his release from jail. They received a phone call from Williams notifying them of a sex party at a hotel in St. Clairsville. Black traveled with his friend to the hotel where they met Williams. In the room were drugs, alcohol and three naked girls (J.L., F.L. and H.G.), whom Black did not know and had never met before that incident.

{¶15} Black further testified that he approached a tall, skinny girl and chose to have sex with her, not learning it was F.L. until he was charged. When he asked her how old they were, F.L. answered "[w]e old enough and said they was 17 to 16." While F.L. was performing oral sex on Black, he saw his friend and H.G. go to the bathroom for sex while Williams and J.L. were on the bed. Black then had vaginal intercourse with F.L. on the pull out couch and ejaculated on her stomach, vaginal area and mattress.

{¶16} Black testified there were clothes on the couch and that F.L. used them to clean his semen off of her. He did not know whose clothes they were. While Black was in the bathroom, he testified that J.L. stumbled towards the bathroom and asked him if he wanted to have sex. Black "told her I was cool for the fact that not only cause she was, basically, like a heavy-set girl, but because she was too overly

intoxicated. She was stumbling and I ain't feel that I wanted to have sex with her." Thereafter, Black testified that Williams and F.L. had sex, and Black received oral sex from H.G. Black stated he received a phone call and told the other men that they had to go.

**{¶17}** The jury found Black guilty and the trial court sentenced him to life with the possibility of parole after ten years and designated him a Tier III sex offender.

## Manifest Weight

**{¶18}** Black's first of four assignments of error asserts:

The jury verdict in this case was against the manifest weight of the evidence.

**{¶19}** "Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id.* This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶20}** Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002–Ohio–1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, a verdict is not against the manifest weight

and should be affirmed. *State v. Smith*, 7th Dist. No. 14 MA 0159, 2016–Ohio–3418, ¶ 49.

**{¶21}** Black was convicted of rape, R.C. 2907.02(A)(1)(b) which prohibits sexual conduct with another who is "less than thirteen years of age, whether or not the offender knows the age of the other person."

**{¶22}** Black argues that since J.L. recanted her statement at trial his conviction is against the manifest weight of the evidence. He denied having sex with J.L. and during his testimony suggested an alternative explanation for how his DNA was found on her underwear.

**{¶23}** Although J.L. did recant her testimony, her recorded forensic interview taken less than 48 hours after the incident was played for the jury. Law enforcement witnesses recounted her statements to them as well as information from the SANE nurse report about the injuries J.L. sustained, concluding it was consistent with all of her pretrial statements. The testimony from the forensic professionals indicated Black was the source of the DNA on J.L.'s underwear. Finally, the jail house phone calls established that Black was attempting to pressure J.L. to recant, lie or not appear at the trial. Moreover, Black testified he was at the hotel, admitted to having sex with F.L. and H.G., but when J.L. offered to have sex with him, he testified he said no. The jury was in the best position to determine and weigh the credibility of all the witnesses' testimony and evidence presented. Thus, we cannot say the jury clearly lost its way. Accordingly, Black's first assignment of error is meritless.

### Sufficiency & Acquittal

**{¶24}** Black's second and third assignments of error are interrelated and will be discussed together for clarity of analysis:

The jury verdict in this case was based on insufficient evidence.

The trial court abused its discretion by overruling Appellant's motion for judgment of acquittal.

**{¶25}** A court must order the entry of a judgment of acquittal on a charged offense if the evidence is insufficient to sustain a conviction on the offense. Crim.R. 29(A). However, "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. Thus, a motion for acquittal tests the sufficiency of the evidence. *State v. Tatum*, 3d Dist. No. 13–10–18, 2011–Ohio–3005, ¶ 43, citing *State v. Miley*, 114 Ohio App.3d 738, 742, 684 N.E.2d 102 (4th Dist.1996).

**{¶26}** A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged." *State v. Petefish*, 7th Dist. No. 10 MA 78, 2011–Ohio–6367, ¶ 16. Thus, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

**{¶27}** Black does not assert that evidence for any element of the offense is lacking. Instead, he reprises his manifest weight argument; since J.L. recanted there is insufficient evidence for a conviction and the case should not have gone to the jury.

**{¶28}** As discussed above, although J.L. recanted at trial, there is sufficient evidence in the record—construed in favor of the State—to support the conclusion that Black engaged in sexual conduct with J.L., who was less than thirteen at the time of the offense. And while Black's testimony cannot be considered regarding the Crim.R.

29 motion made at the end of the State's case in chief, we do consider it for purposes of the motion he made at the end of the trial, as well as his general sufficiency argument on appeal. Accordingly, Black's second and third assignments of error are meritless.

## Hostile Witness

**{¶29}** Black's final of four assignments of error asserts:

The trial court abused its discretion by permitting the alleged victim in this case to be cross-examined by the State of Ohio as a hostile witness.

**{¶30}** The Second District recently addressed this issue:

A "hostile witness" is one who surprises the calling party at trial by turning against that party while testifying. *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, 2004 WL 1171876, ¶ 15. A "hostile witness" is addressed under Evid.R. 607, which states that the "credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." For purposes of the rule, a party demonstrates surprise when a witness's trial testimony is "materially inconsistent" with a prior statement and counsel did not have reason to believe that the witness would repudiate the prior statement. *State v. Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237 (2d Dist.); *State v. Eicholtz*, 2d Dist. Clark No. 2012 CA 7, 2013-Ohio-302, 2013 WL 425820, ¶ 38. "Affirmative damage" exists when a witness's trial testimony contradicts, denies, or harms the case of the party who called that witness; it does not exist when a witness denies knowledge or fails to remember. *Eicholtz* at ¶ 38, citing *Dayton v. Combs*, 94 Ohio

App.3d 291, 299, 640 N.E.2d 863 (2d Dist.1993); *State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, 2010 WL 892083, ¶ 74.

"When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Evid.R. 611(C). "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, citing 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. This rule gives the court discretion to allow counsel to proceed with leading questions so that, in effect, the direct examination becomes a cross-examination by leading questions. *Darkenwald* at ¶ 14.

The decision as to whether a witness is a "hostile" witness, which includes whether the elements of surprise and affirmative damage have been established, is entrusted to the broad, sound discretion of the trial court. *State v. Diehl*, 67 Ohio St.2d 389, 391, 423 N.E.2d 1112 (1981).

*State v. Johnson,* 2d Dist. 26055, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 33-35.

{¶31} Black argues that there were no inconsistent statements made by the victim, nor was there any surprise to the State at the time she was declared hostile. The record demonstrates otherwise.

{¶32} Despite being presented with the video of her interview at Harmony House less than 48 hours after the incident, the prosecutor questioning her about her statements to medical and law enforcement personnel and the other evidence which corroborated all the statements she made before trial, J.L. continued to testify that all of her prior statements were lies and that she did not engage in any sexual conduct with Black. J.L.'s statements at trial were materially different from her previous statements. The record demonstrates this was surprising to the State, and her recantation damaging to its case. Thus, the trial court did not abuse its discretion in

declaring the victim a hostile witness. Accordingly, Black's fourth assignment of error is meritless.

{¶33} In sum, Black's conviction was supported by the weight and sufficiency of the evidence, and the trial court did not err in declaring the victim to be a hostile witness. Accordingly, his assignments of error are meritless, and the judgment of the trial court is affirmed.

Waite, J., concurs.

Robb, P. J., concurs.